In re Theophilus GREEN, Debtor.

**Massachusetts Casualty Insurance Company, Plaintiff,**

**v.**

**Theophilus Green, Defendant.**

**Theophilus Green, Counter–Plaintiff,**

**v.**

**Massachusetts Casualty Insurance Company, Counter–Defendant.**

Bankruptcy No. 97 B 32525.
Adversary No. 98 A 01174.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Nov. 22, 1999.

John D. Lien, & Frank DiCastri, Foley & Lardner, Chicago, IL, Larry R. Eaton & Bruce M. Lichtcsien, Blatt, Hammesfahr & Eaton, Chicago, IL, for Movant or Plaintiff.

Theophilus E. Green, Psy.D, for pro se.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on several motions. Massachusetts Casualty Insurance Company ("MCIC") filed an Amended Complaint (the "Amended Complaint") in which it seeks: (1) a declaration that a debt for disability benefits paid to Theophilus Green ("Green") is nondischargeable due to fraud under § 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 101 et seq., and (2) a declaration

that an award of discovery sanctions granted to it against Green in the Circuit Court of Cook County, Illinois is nondischargeable as a debt for willful and malicious injury under § 523(a)(6). MCIC moves for summary judgment in its favor on the Amended Complaint and prayer for rescission of the insurance contracts. Green, a *pro se* litigant, moves to dismiss MCIC's Amended Complaint. Green also moves for summary judgment in his favor on the Amended Complaint.

Green has filed a six-count Second Amended Counterclaim (the "Second Amended Counterclaim") against MCIC, seeking damages for: Breach of Contract (Count I); Tortious Interference of Contract (Count II); Breach of Contract (Count III); Collusion and Bad Faith Claims Practices (Count IV); Negligence (Count V); and Filing Bad Faith Claims Before the State Court (Count VI). Green moves for summary judgment on the Second Amended Counterclaim. MCIC moves for summary judgment on the first three counts of the Second Amended Counterclaim.[1] MCIC also moves to dismiss Counts IV, V, and VI of the Second Amended Counterclaim.

Green has also filed a Motion to Exclude All Medical Information Not Within the Four Corners of the Contract in Contest (the "Motion to Exclude Medical Information").

For the reasons set forth herein, the Court denies Green's Motion to Exclude Medical Information. Counts II, IV, V, and VI of the Second Amended Counterclaim are dismissed without prejudice for lack of subject matter jurisdiction; Green may pursue those causes of action in a court that has jurisdiction. The insurance contracts are rescinded and void. The Court grants MCIC's motion for summary judgment on Counts I (Breach of Contract) and III (Breach of Contract) of the Second Amended Counterclaim. The

Court also grants MCIC's motion for summary judgment on its claim under 11 U.S.C. § 523(a)(2)(A). The Court denies MCIC's motion for summary judgment on its claim under 11 U.S.C. § 523(a)(6); Green's motion for summary judgment on that claim is granted. The Court denies Green's Motion to Dismiss MCIC's Amended Complaint.

## I. FACTUAL BACKGROUND

This background statement has been compiled using the parties' statements of uncontested facts, pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.

In 1993, Green was a licensed clinical psychologist practicing in Chicago, Illinois. He is a veteran of the United States Armed Forces, in which he served from 1965 until 1968.

On December 16, 1993, Green applied for disability insurance and overhead disability insurance from MCIC. Alan Bloomfield ("Bloomfield"), an insurance agent, completed the applications (the "Applications") using information provided by Green and information contained in Green's prior insurance policy. The Applications contained the following questions:

8. Have you ever been treated for or had any known indication or symptom of . . .

(a) chest pain, high blood pressure, mental, nervous or emotional conditions (to include but not limited to anxiety, depression or stress) . . . ?

11. In the past 5 years, have you:

 . . . .

(b) received or been refused any disability or medical benefits . . . ?

Green answered "No" to both questions.

In the Applications, Green authorized an exhaustive list of medical care providers and related entities, including insurance

---

1. When MCIC filed its motion for summary judgment, Green's Amended Counterclaim was before the Court. Green subsequently filed the Second Amended Counterclaim, which added Counts IV, V, and VI.

companies and the Veterans Administration (the "VA"), to release medical and non-medical information about him to MCIC (the "Releases"). The Applications each contained a statement certifying that the statements made therein were true and complete and that Green understood that false statements might result in loss of coverage. On December 16, 1993, Green signed and dated the Applications.

On March 11, 1994, MCIC issued disability policy number 0611031 with Green as the insured. That policy provided in part that if Green became disabled before his sixty-second birthday then MCIC would pay benefits of $4,400 per month. The same day, MCIC also issued overhead disability policy number 0613764 which provided in part that MCIC would pay up to $5,000 a month for Green's office expenses in the event that Green became disabled.

On March 28, 1994, Green submitted to MCIC two Statement of Health Forms (the "Statements"). The Statements specified that when executed, they would become part of the insurance policies. The Statements also required that "[t]he Agent shall not deliver the Policy unless the insured completes and signs this Statement which represents there has been no change in his or her health." The Statements contain the following additional representations:

1. I, the Insured under the above-numbered Policy, in order to induce the Company to issue and deliver the said Policy to me hereby represent that I am now and have continued in the same status of health (mental and physical) as indicated in the application for said Policy....

2. I further represent that since the date of the aforesaid application ... (1) I have had no injuries, ailments or illnesses and have not been sick from any cause, (2) I have not consulted or been prescribed for or attended by a physician or practitioner for any cause, and have not been confined to any hospital or institution.

3. I hereby represent to the best of my knowledge and belief that all of the foregoing statements are true and complete.

Green signed and dated the Statements.

In June, 1994, Green suffered a stroke and made a claim for benefits under the disability policies. MCIC paid Green a total of $39,940.50 in benefits.

MCIC began investigating Green's claims. MCIC entered into correspondence with Dr. Patrick Israel ("Israel"), a psychiatrist practicing in a suburb of Chicago. In a letter dated December 9, 1994, Israel states in part:

Dr. Green has been under my professional care since 1985. Intervals of therapy have varied from weekly to monthly in frequency. His symptoms have consisted of recurring episodes of depression and anxiety.

In the past several years there has been increasing difficulty in functioning in his profession, in response to which he has progressively decreased his work hours and accepted fewer and fewer referrals of clients.

The psychotherapy has been supportive but has not altered his progressive functional impairment. He will continue to receive psychotherapy as needed.

Two later letters from Israel, dated January 26, 1995 and January 31, 1995, respectively, explain that Green was discharged from treatment on December 16, 1987. The letters further explain that eight visits from January, 1989 through the winter of 1990 were consultations about Green's practice. In August, 1990, Green "returned to discuss again problems with the mental health administration and to deal with some difficulties in family and social relationships." Israel testified that, until 1994, he treated Green for depression, stress, or anxiety. In addition, Israel consulted with Green about his work. The

last record Israel has of treating Green is in August, 1994.

During his deposition, Israel explained that he diagnosed Green as suffering from dysthymia, or minor depression. Israel prescribed one hour psychotherapy sessions for him. Israel submitted claims to Green's health insurer and the claims were paid.

On September 7, 1992, Israel's billing records show that he filed a disability report with the City of Chicago, Green's then-employer, on Green's behalf. Israel further testified that on November 4, 1991, he drafted a report to the VA. Israel sent the report because Green was seeking mental and emotional disability benefits from the VA. In the report, Israel explains:

> [Green] had been in urgent need of treatment for a long time but his fear and distrust of authority, paranoid in intensity, has previously made him unable to tolerate more than an occasional visit to one or another psychiatrist to obtain medication. He was taking Chlorpromazine, 400 mg per day as needed to control episodes of severe agitation during which he feared loss of control. He worked sporadically, when his condition was in partial remission, in a semi-volunteer capacity at an alcoholism clinic.... There has been some progress in terms of a lessening of tension and longer periods of superficially adequate social appearance and vocational functioning, but the underlying paranoia and depression are constant and his surface adequacy is accomplished via intense conscious effort. He is required to keep regular control over recurring impulses to self-harm or violence toward others.... His psychopathology repeatedly interferes with his vocational efforts....

While investigating Green's claims, MCIC discovered that Green had been receiving disability benefits from the VA since at least 1989, based on the VA's 1968 diagnosis of Green as a paranoid schizophrenic. During his deposition, Green testified that he had been on disability from the military since 1968.

On January 14, 1994, after signing the Applications but before signing the Statements of Health, Green submitted to the VA a Statement in Support of Claim in which he requested that the VA increase his disability benefits from the 70% level to the 100% level. He listed six hospital stays that took place over the period May, 1988 through May, 1993. Green stated that "I am a veteran who has been disabled for more than 25 years and my doctor says I am entitled to stop frequent evaluations because he says they aggravate my condition."

On February 6, 1995, MCIC sent Green a letter notifying him of its decision to rescind the disability insurance policies. The letter notifies Green that "the company is obliged to disallow your Claims and rescind your policies as of the date of issue." The letter explained that, had MCIC not paid $39,940.05 in benefits, Green would be entitled to a refund of $3,257.19 for premiums paid. MCIC requested that Green repay $36,682.86, the amount of benefits paid less the refund of premiums.

On March 13, 1995, Green wrote to a claims manager at MCIC. Green wrote:

> I was informed by Dr. Piening that you apparently requested information after a formal decision had been made to deny me the benefits of my policy. I have no concerns with your verifying information, but since you have unilaterally cancelled the policy, I question your right or need to information regarding me. This letter is to formally rescind my release of information of personal records and request that you send copies of all information received by any treating physician to me....

On September 13, 1995, MCIC filed a two-count Complaint for Rescission of Insurance Contracts ("Rescission Complaint") against Green in the Circuit Court

of Cook County of Illinois (the "Circuit Court"). In Count I, MCIC sought rescission of the two disability policies. In Count II, MCIC sought recovery of the $39,940.05 in benefits paid to Green under the policies. MCIC based the Rescission Complaint on Green's material misrepresentation of his medical history.

During the pendency of the litigation in the Circuit Court, Green requested, and obtained, his original medical treatment records from Israel. Green then ripped the cards on which Israel had kept the records into quarters. On June 17, 1997, the Circuit Court entered the following judgment for sanctions against Green:

> It is hereby ordered that the Court, having had the benefit of the testimony of Dr. Green and Dr. Israel is satisfied that [MCIC] received all of Dr. Israel's records that they would have received, had they obtained them directly from Dr. Israel. Therefore, Dr. Green's conduct is not sufficient to hold him in default.

> It is hereby ordered that a person of Dr. Green's intelligence and experience should have known that his conduct in requesting original treating physician's records directly rather than through counsel, would at the very least, cause some detriment, inconvenience and additional labor to the plaintiffs. While Dr. Green eventually produced the torn up pieces of Dr. Israel's records, had they not been produced, [MCIC] would have had a serious case for spoliation of evidence. Counsel for [MCIC] is correct in asserting that some sanction is proper.

## II. BANKRUPTCY HISTORY

On October 22, 1997, Green filed a petition for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. The case was subsequently converted to a Chapter 7 case. The bankruptcy filing,

pursuant to 11 U.S.C. § 362, automatically stayed the action in the Circuit Court. MCIC filed the instant adversary proceeding against Green, seeking an award of $48,455.58 in damages and also seeking a declaration that the debt is nondischargeable.

■ Green subsequently filed a Counterclaim, an Amended Counterclaim, and a Second Amended Counterclaim, all seeking damages under various common law theories. After the no asset report was filed, the Court invited the trustee to consider whether he wished to vacate the no asset report and pursue the counter-claims on behalf of the estate.[2] After investigation, the trustee determined to take no action. The counter-claims are thus abandoned to Green.

## III. JURISDICTION

■ Before reaching the merits of either party's case, the Court must determine whether it has jurisdiction over the issues presented. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). The Court "has a duty to resolve apparent jurisdictional questions even where the parties do not raise them." *Yasuda Fire & Marine Ins. Co. of Europe, Ltd. v. Continental Casualty Co.*, 37 F.3d 345, 347 (7th Cir. 1994).

■ Bankruptcy jurisdiction should be interpreted narrowly. *In re FedPak Systems, Inc.*, 80 F.3d 207, 213–14 (7th Cir. 1996). The United States District Courts' bankruptcy jurisdiction extends to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The bankruptcy courts receive their powers by delegation or reference from the district courts pur-

---

**2.** The filing of a no asset report constitutes an abandonment of listed, unadministered property in a debtor's bankruptcy schedules. 11 U.S.C. § 554(c). However, Green did not schedule his counter-claims and the trustee abandoned them pursuant to 11 U.S.C. §§ 554(a) and (d).

suant to 28 U.S.C. § 157. The District Court for the Northern District of Illinois has referred all bankruptcy cases under its jurisdiction to this court. N.D. ILL. LOCAL GENERAL RULE 2.33(A). Thus, through the reference from the district court, this court has jurisdiction over matters arising under, arising in, or related to bankruptcy cases under 28 U.S.C. § 1334.

■■■■ Section 157 further limits bankruptcy jurisdiction by dividing the matters which the court may hear into two categories: core and non-core. Bankruptcy courts may enter final orders and judgments, subject to appeal, in core proceedings. 28 U.S.C. § 157(b). However, in non-core proceedings a bankruptcy court must submit proposed findings of fact and conclusions of law to the district court, which has the power to enter the final order. 28 U.S.C. § 157(c). Core matters are those "arising under" title 11 or "arising in" a case under title 11. 28 U.S.C. § 157(b).

■■■■ A matter "arising under" title 11 involves a cause of action created or determined by a statutory provision of title 11. *Barnett v. Stern,* 909 F.2d 973, 981 (7th Cir.1990); *Wood v. Wood (In re Wood),* 825 F.2d 90, 96 (5th Cir.1987). A proceeding "arising in" a case under title 11 involves those administrative matters that arise only in bankruptcy cases. *Diamond Mtg. Corp. of Illinois v. Sugar,* 913 F.2d 1233, 1239 (7th Cir.1990); *Wood,* 825 F.2d at 97. " '[A]rising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Wood,* 825 F.2d at 97.

In its motion for summary judgment, MCIC asserts that the Court has core jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(C) and (b)(2)(I).[3] However, MCIC has oversimplified the case. There are separate com-

ponents to these proceedings: (1) the dischargeability determination and (2) the causes of action set forth in Green's Second Amended Counterclaim. MCIC's blanket allegation of jurisdiction does not cover them both.

■■■■ Section 157(b)(2)(I) provides that determinations as to the dischargeability of debts are core proceedings. 28 U.S.C. § 157(b)(2)(I). The claims in MCIC's Amended Complaint, under 11 U.S.C. § 523(a)(2)(A) for fraud and 11 U.S.C. § 523(a)(6) for willful and malicious injury, are core under this section. MCIC's prayer for rescission also is core under this section; rescission is a proper remedy for fraud in the formation of a contract.

■■■■ The Court also has jurisdiction over Counts I and III of Green's Second Amended Counterclaim, each for breach of the insurance contracts. They are compulsory counterclaims to MCIC's Amended Complaint and prayer for rescission under Fed.R.Bankr.P. 7013. Rule 7013 provides:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed.R.Bankr.P. 7013.

■■■■ The Seventh Circuit uses the "logical relationship" test to determine whether a counterclaim is compulsory. *Colonial Penn Life Ins. Co. v. Hallmark Ins. Admins., Inc.,* 31 F.3d 445, 448 (7th Cir.1994). Under that test, a counterclaim is compulsory if it arises from the same transaction or set of circumstances as the claim. *Valencia v. Anderson Bros. Ford,* 617 F.2d 1278, 1291 (7th Cir.1980), *rev'd on*

---

**3.** Green did not include a jurisdictional statement in any pleadings or motions filed with

the Court.

*other grounds,* 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981); *see also, Burlington Northern R.R. Co. v. Strong,* 907 F.2d 707, 711 (7th Cir.1990). "Whether a particular counterclaim should be considered compulsory depends not so much on the immediacy of its connection with the plaintiff's claim as upon its logical relationship to that claim." *Valencia,* 617 F.2d at 1291. *Walker v. Contimortgage (In re Walker),* 232 B.R. 725, 730 (Bankr.N.D.Ill. 1999).

Green's claims that MCIC breached the Policies arise from MCIC's efforts to rescind those Policies due to Green's fraud. The events that caused MCIC to seek rescission are the same as those that led to the alleged breach. A determination as to one issue inevitably leads to a determination as to the other. The claims are immediately connected and logically related. Given the facts of this case, Green's counterclaims for breach of contract are core proceedings subject to the jurisdiction of this Court.

█ However, Counts II, IV, V, and VI of the Second Amended Counterclaim are not core proceedings under 28 U.S.C. § 157(b)(2)(I). They are not compulsory counterclaims to the Amended Complaint. The facts alleged in those counts center on MCIC's conduct during the course of its litigation against Green. They are not immediately connected with the events leading to the prayer for rescission and the complaint to determine dischargeability, i.e. Green's fraudulent misrepresentations in the Applications.

Nor is there jurisdiction under § 157(b)(2)(C). That section encompasses only those counterclaims brought by the bankruptcy estate against persons filing claims against the estate. 28 U.S.C. § 157(b)(2)(C). The trustee has abandoned the causes of action set forth in the Second Amended Counterclaim and therefore, none of those causes of action are part of the bankruptcy estate. The estate did not bring the Second Amended Counterclaim; Green brought it on his own

behalf. Section 157(b)(2)(C) does not apply to the Second Amended Counterclaim.

The common law causes of action set forth in Counts II, IV, V, and VI of Green's Second Amended counterclaim do not arise under title 11. They do not involve substantive rights created by the Bankruptcy Code. Nor do they arise in a case under title 11. They do not involve administrative matters that could arise only in a bankruptcy proceeding. Therefore, the Court has jurisdiction over them only if they are related to this bankruptcy proceeding.

█ Non-core matters over which bankruptcy courts have jurisdiction are those "related to" a bankruptcy case.

> The reference to cases related to bankruptcy cases is primarily intended to encompass tort, contract, and other legal claims by and against the debtor, claims that were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum.

*Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161 (7th Cir.1994). Although neither the Bankruptcy Code nor the jurisdictional statutes define the term "related to," the Seventh Circuit holds that a case is "related to" a bankruptcy when it affects either the amount of property in the bankruptcy estate or the distribution of that property among the creditors. *FedPak,* 80 F.3d at 213–14; *Elscint, Inc. v. First Wisconsin Financial Corp. (In re Xonics, Inc.),* 813 F.2d 127, 131 (7th Cir.1987).

█ When property leaves the bankruptcy estate, whether by sale or otherwise, the bankruptcy court's jurisdiction over that property lapses. *Xonics,* 813 F.2d at 131. A bankruptcy court has no jurisdiction over property that is no longer part of the bankruptcy estate. *In re Edwards,* 962 F.2d 641, 643 (7th Cir.1992). When a trustee abandons property to the

debtor, there is no remaining basis for bankruptcy court jurisdiction. *In re Abma,* 215 B.R. 148, 152 (Bankr.N.D.Ill. 1997). The causes of action set forth in Counts II, IV, V, and VI of the Second Amended Counterclaim are not related to the bankruptcy proceeding.

 In addition, while the Seventh Circuit has not yet decided the question of whether bankruptcy courts can exercise supplemental jurisdiction, it has stated that the relationship between supplemental jurisdiction under 28 U.S.C. § 1367 and "related to" proceedings in bankruptcy is "functionally identical." *Chapman v. Currie Motors, Inc.,* 65 F.3d 78, 81 (7th Cir. 1995). The general rule is that a federal court should decline to exercise supplemental jurisdiction over state law issues when the federal issues have been eliminated prior to trial. *Carr v. CIGNA,* 95 F.3d 544, 546 (7th Cir.1996); *Korzen v. Local Union 705, Int'l Brotherhood of Teamsters,* 75 F.3d 285, 288 (7th Cir.1996); *Turner v. Bowens,* No. 95 C 4530, 1997 WL 85174, at *1 (N.D.Ill. Feb. 23, 1997).

This court lacks subject matter jurisdiction over the causes of action set forth in Counts II, IV, V, and VI of the Second Amended Counterclaim. They are dismissed without prejudice. Green may proceed against LifeUSA in the Illinois courts or in any other court that has subject matter jurisdiction.

## IV. APPLICABLE STANDARDS

Before the Court are: (1) MCIC's Amended Complaint seeking a declaration that Green's debt is nondischargeable in bankruptcy; (2) Green's six-count Counterclaim; (3) MCIC's motion to dismiss three counts of the Counterclaim; (3) MCIC's motion for summary judgment in its favor on its Amended Complaint and against Green on his Counterclaim; (4) Green's motion to dismiss the Amended Complaint; (5) Green's motion for summary judgment on the Amended Complaint and on the Counterclaim; and (6) Green's motion to exclude medical records.

### A. Motions to Dismiss

For a defendant to prevail on a motion to dismiss, it must appear from the complaint that the plaintiff can prove no set of facts which could entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must assume the truth of all well-pleaded factual allegations and make all possible inferences in favor of the plaintiff. *Gorski v. Troy,* 929 F.2d 1183, 1186 (7th Cir.1991). The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff has pleaded a cause of action sufficient to entitle it to go forward with the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Federal notice pleading standards require only that the plaintiff give the defendant fair notice of its claims and the grounds for those claims. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993), *Conley,* 355 U.S. at 47, 78 S.Ct. 99. However, mere conclusory allegations unsupported by factual assertions will not withstand a motion to dismiss. *Briscoe v. LaHue,* 663 F.2d 713 (7th Cir.1981), *aff'd.,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1983), *cert. denied sub nom. Talley v. Crosson,* 460 U.S. 1037, 103 S.Ct. 1426, 75 L.Ed.2d 787 (1983). A complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992), *cert. denied,* 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992), *In re Handy Andy Home Improvement Ctrs., Inc.,* 1997 WL 268354 at *2 (Bankr.N.D.Ill. 1997).

A complaint alleging fraud must meet a heightened pleading standard. A plaintiff pursuing a claim of fraud must state with particularity the circumstances constituting the fraud. FED.R.CIV.P. 9(b). The Seventh Circuit has held that Rule 9(b), as incorporated through Bankruptcy Rule

7009, requires a plaintiff alleging fraud in a complaint to state "the who, what, when, and where of the alleged fraud." *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992).

## B. Summary Judgment

The purpose of summary judgment under Federal Rule of Civil Procedure 56 is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries v. Stanadyne/Chicago Division,* 832 F.2d 374, 378 (7th Cir.1987); *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Assoc. of Indianapolis,* 806 F.2d 146, 149 (7th Cir. 1986). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Matsushita Elect. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Trautvetter v. Quick,* 916 F.2d 1140, 1147 (7th Cir.1990). The existence of factual disputes is sufficient to deny summary judgment only if the disputed facts are outcome determinative. *Jones Truck Lines, Inc. v. Republic Tobacco, Inc.,* 178 B.R. 999, 1003 (Bankr. N.D.Ill.1995). The burden is on the moving party to show that there is no such factual dispute. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *In re Chicago, Missouri & Western Ry. Co.,* 156 B.R. 567 (Bankr.N.D.Ill.1993). This burden is met when the record, as a whole, does not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted).

The respondent may not rest upon mere allegations or denials in its pleadings. *Id.*

## V. DISCUSSION

### A. Green's Motion to Exclude All Medical Information Not Within the Four Corners of the Contract in Contest

Green asks the Court to exclude his medical records for two reasons: (1) that on March 13, 1995, he canceled the Releases of medical information which he had given to MCIC in his Applications and (2) that the Illinois Mental Health and Developmental Disability Confidentiality Act (the "Confidentiality Act"), 740 ILCS 11¼ *et seq.*, allows him to prevent the disclosure of his records or communications unless disclosure is authorized by court order after an *in camera* inspection of the records. Neither reason is sufficient to exclude Green's medical records under the circumstances of this case.

MCIC began its investigation into Green's medical history while the Releases were still valid. Israel wrote to MCIC about Green on December 9, 1994, January 26, 1995, and January 31, 1995. In those letters, Israel stated that Green's "symptoms have consisted of recurring episodes of depression and anxiety;" that Green suffered "progressive functional impairment;" that he provided "psychotherapy directed at the emotional symptoms of which [Green] complained;" and that while later visits included consultations about Green's practice, those visits were also to "deal with some difficulties in family and social relationships." Green did not write the letter canceling the Releases until March 13, 1995. MCIC thus corresponded with Israel in accordance with the terms of the Releases. Green's subsequent revocation of the Releases does not retroactively invalidate all information legitimately obtained.

By virtue of the Releases, MCIC discovered and obtained evidence that Green had falsely answered Question 8 of the Applica-

tions. In response to Question 8, Green stated that he had not been "treated for or had any known indication or symptom of ... mental, nervous or emotional conditions (to include but not limited to anxiety, depression or stress)...." Israel's letters make it clear that Green had been treated for depression and anxiety. Those letters alone would be enough to support MCIC's claim that Green misrepresented his medical history in the Applications.

▮ However, the Court may also consider the records of medical treatment and disability payments that MCIC obtained after Green revoked the Releases. Green waived the privilege created by the Confidentiality Act.

Section 10 of the Confidentiality Act provides that a recipient of mental health services has the privilege to refuse to disclose and to prevent the disclosure of the recipient's record or communications. 740 ILCS 110/10(a). Section 10 then further provides ten exceptions to this rule. One exception is that the recipient's records may be disclosed in proceedings involving the validity of or benefits under a disability insurance policy if the recipient's mental condition or treatment and services in connection with it is a material part of the claim or defense of any party. 740 ILCS 110/10(a)(7).

Section 10(b) limits the exceptions provided in Section 10(a). It allows any party to the proceeding to request an *in camera* review of the records before disclosure. 740 ILCS 110/10(b). On July 27, 1999, in open court, Green waived his right to an *in camera* inspection of his medical records and the records received from the VA. The Court entered an order to that effect on August 3, 1999.

MCIC challenges the validity of the disability policies and seeks the return of benefits paid under them. Green's mental condition and treatment history are the

very bases for MCIC's claim and are also the bases for its defense to Green's Counterclaim. This proceeding falls squarely within the exception to confidentiality provided by Section 10(a)(7) of the Confidentiality Act. Green's Motion to Exclude Medical Records must accordingly be denied.

**B. MCIC's Motion for Summary Judgment**

In its motion for summary judgment, MCIC asks the Court to enter summary judgment in its favor on its Amended Complaint; to enter summary judgment in its favor and against Green on Counts I, II, and III of Green's Counterclaim; to declare that disability policies 0611031 and 0613764 (the "Disability Policies") are rescinded and void; and to enter judgment against Green for fees, costs, and interest.

In its Amended Complaint, MCIC seeks a determination that Green's debt to it for benefits paid to him in the amount of $39,940.05 is nondischargeable under 11 U.S.C. § 523(a)(2)(A). MCIC also seeks a determination that the sanction ordered by the Circuit Court in the amount of $8,515.53 is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[4]

▮ The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 961 (Bankr.N.D.Ill. 1995). To further the policy of providing a debtor a fresh start in bankruptcy, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of a debtor." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir.1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985)).

---

4. MCIC has drafted its Amended Complaint in only one count. For the sake of clarity, the

Court will discuss its two claims separately.

### 1. Nondischargeability Under § 523(a)(2)(A)

■ Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the dischargeability of debts. Section 523(a)(2)(A) provides:

(1) A discharge under section 727 ... does not discharge an individual debtor from any debt-

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-

(A) false pretenses, a false representation, or actual fraud, other than a statement other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). To prevail on a complaint to determine dischargeability under § 523(a)(2)(A), a plaintiff must establish several elements. First, the plaintiff must show that the debtor obtained money, property, services, or an extension, renewal or refinancing of credit from it by making representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation. *Scarlata*, 979 F.2d at 525; *see also, Mayer v. Spanel*, 51 F.3d 670, 673–74 (7th Cir.1995) (discussing the elements of a claim under § 523(a)(2)(A)). The plaintiff must also show that the debtor acted with an intent to deceive. *Scarlata*, 979 F.2d at 525. Finally, the plaintiff must show that it justifiably relied on the debtor's false statements. *Field v. Mans*, 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

■ Both parties agree that Green obtained two insurance policies from MCIC and that MCIC paid Green $39,940.05 in benefits under the terms of those policies. The first question is whether he obtained them by representations which he either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation.

MCIC issued the Disability Policies to Green based upon the information provided in the Applications and Statements of Health which Green signed, certifying that the statements contained therein were true. Green's statement that he had never been "treated for or had any known indication or symptom of ... mental, nervous or emotional conditions (to include but not limited to anxiety, depression or stress)", made in response to Question 8 of the Applications, is patently untrue. So is his statement, made in response to Question 11, that he had not received disability benefits from any source for the five years prior to completing the Applications. In his deposition, Green himself admitted that the answer to Question 8 should have been "Yes" rather than "No." Israel, Green's psychiatrist, wrote letters and reports to MCIC and the VA, indicating that Green suffered from depression, anxiety, and paranoia, among other things. Even if Green believed that his visits to Israel were only for purposes of professional consultation (thus removing his misrepresentations about those visits from the realm of knowing or reckless misrepresentation), he clearly knew that he had been diagnosed as a paranoid schizophrenic. He had been accepting monthly benefits from the VA in excess of $1,500 since at least December, 1989. In a successful attempt to have those benefits increased, he stated to the VA that he had been disabled for 25 years and listed six hospitalizations over five years in support of his claim. Bloomfield, the insurance agent, certified that he had truly and accurately recorded on the Applications all the information supplied by Green. Green knew that his representations in response to Questions 8 and 11 were false. Even if, as Green has sometimes stated, he signed the Applications without ever having seen them, he then acted with reckless disregard for the truth.

■ The next question is whether Green intended to deceive MCIC. Where a person knowingly or recklessly makes false representations which the person

knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. *In re Sheridan,* 57 F.3d 627, 633 (7th Cir.1995); *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421 (inferring an intent to deceive from the debtor's knowing misrepresentation, made to induce the plaintiff to lend him money, that he had shipped orders, when in fact, he had not shipped any goods); *Carini v. Matera (In re Matera),* 592 F.2d 378, 380 (7th Cir.1979) (inferring an intent to deceive where the debtor falsely stated that his business was profitable to induce the plaintiff to lend him money); *Zirkel v. Tomlinson (In re Tomlinson),* Nos. 96 B 27172, 96 A 1539, 1999 WL 294879, at *10 (Bankr.N.D.Ill. May 10, 1999) (inferring an intent to deceive where an investment advisor failed to disclose legal actions and various professional sanctions against him knowing that his potential client would decline to invest with him if he knew the truth); *Kadlecek v. Ferguson (In re Ferguson),* 222 B.R. 576, 585 (Bankr.N.D.Ill.1998) (inferring an intent to deceive from a builder's false statements, made to attract and reassure the buyer, that he would build a home using an architect's plans and would build the home to standards exceeding those in the building code).

Under the circumstances of this case, the Court has no choice but to infer that Green intended to deceive MCIC. Green wanted insurance from MCIC and omitted significant portions of his medical and disability history to get it. He acknowledged, by signing the Applications, that the information provided therein was the basis for any policy of insurance. MCIC has submitted affidavits stating that it would not have issued the Disability Policies to Green had it known his true medical history. Green intended to deceive MCIC.

The final question is whether MCIC justifiably relied on Green's misrepresentations. That MCIC actually relied on Green's misrepresentations is apparent: MCIC issued two disability policies and paid substantial sums in benefits before it discovered the truth. Was that reliance justifiable?

Justifiable reliance is an intermediate level of reliance; it is less than reasonable reliance, but more than mere reliance in fact. *Field,* 516 U.S. at 74–75, 116 S.Ct. 437. The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is apparent upon a cursory glance. *Id.* at 70, 77, 116 S.Ct. 437; *Golant v. Care Comm, Inc.,* 216 B.R. 248, 254 (N.D.Ill.1997); *AT & T Universal Card Services v. Alvi (In re Alvi),* 191 B.R. 724, 730 (Bankr.N.D.Ill. 1996). There is no duty to investigate unless the recipient of a false statement is capable of appreciating its falsity at the time by the use of his senses. *Field,* 516 U.S. at 71, 116 S.Ct. 437, quoting RESTATEMENT (SECOND) OF TORTS § 541 cmt. a.

There is nothing about the Applications that should have put MCIC on alert. On their faces, the Applications are perfectly unexceptional. They have been properly filled out and signed by both the proposed insured (Green) and the insurance agent (Bloomfield). Both Green and Bloomfield certified that the statements contained therein were true. MCIC knew nothing about Green that should cause it to investigate him more fully before issuing him insurance policies. Upon a cursory glance, Green was a healthy man in his mid-forties, practicing psychology in the city of Chicago, who wanted to buy insurance. Absolutely nothing about the Applications indicates that Green's representations of health were false and that he had a long and complex medical history. MCIC justifiably relied on Green's misrepresentations.

MCIC has established the elements necessary to a determination of nondischargeability under § 523(a)(2)(A). Green's debt to MCIC for benefits paid to him is nondischargeable in bankruptcy.

### 2. Nondischargeability Under § 523(a)(6)

Section 523(a)(6) provides that a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity" is nondischargeable in bankruptcy. 11 U.S.C. § 523(a)(6). The Supreme Court has held that § 523(a)(6) applies only to those acts "done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–63, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). Debts arising from recklessly or negligently inflicted injuries are dischargeable under § 523(a)(6). *Id.* at 978.

Relying on an opinion written before *Kawaauhau*, MCIC mistakenly argues that a creditor seeking a determination of nondischargeability need not prove that the debtor intended to cause /harm. MCIC neither alleges nor offers evidence that Green intended to harm it by ripping up his records and the Circuit Court's order makes no such finding. Rather, the Circuit Court wrote that Green "should have known that 'his conduct ... would at the very least, cause some detriment, inconvenience and additional labor to the plaintiffs.'" "Should have known" language is generally associated with a negligence standard. *See, e.g., Brown v. M & M/Mars*, 883 F.2d 505, 512 (7th Cir.1989) (ruling that a "should have known" instruction was insufficient to support even a finding of recklessness).

MCIC has also failed to connect its damages to Green's actions. It has merely submitted to the Court a copy of the Circuit Court's order for fees and costs. It has neither alleged that those fees and costs directly relate to Green's behavior nor alleged that Green's conduct caused it to be damaged. The $8,515.53 debt for sanctions will be discharged. Summary judgment is entered in favor of Green on this claim.

### 3. Rescission of the Insurance Policies

MCIC did not request rescission of the Policies in its Amended Complaint. It sought only a determination that Green's debts to it were nondischargeable. However, once Green filed his counterclaim, MCIC filed a response which requested rescission. "Every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed.R.Civ.P. 54(c).

Section 154 of the Illinois Insurance Code, 215 ILCS 5/1 *et seq.*, governs the circumstances under which MCIC may rescind an insurance policy obtained by misrepresentations or false warranties. Section 154 provides in pertinent part:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company.

215 ILCS 5/154.

In this case, MCIC must show: (1) that the Applications contain a misrepresentation made by Green or on Green's behalf and (2) that the misrepresentations were made with the intent to deceive or materially affected the risk accepted by MCIC. *Methodist Medical Center of Illinois v. American Medical Security, Inc.*, 38 F.3d 316, 319 (7th Cir.1994). An applicant for an insurance policy has a duty to act in good faith towards the proposed insurer and to "make a complete and truthful disclosure of all relevant information so that the insurer may determine whether the applicant meets the insurer's underwriting criteria." *New England*

*Mutual Life Ins. Co. v. Bank of Illinois in DuPage,* 994 F.Supp. 970, 976 (N.D.Ill. 1998). A material misrepresentation will avoid coverage, even if it is made through mistake or in good faith. *Methodist Medical,* 38 F.3d at 320.

 A misrepresentation in an application for insurance is "a statement of something as a fact which is untrue and affects the risk undertaken by the insurer." *Methodist Medical,* 38 F.3d at 319, quoting *Northern Life Ins. Co. v. Ippolito Real Estate Ptrshp.,* 234 Ill.App.3d 792, 801, 176 Ill.Dec. 75, 81, 601 N.E.2d 773, 779 (1992). Incomplete answers and failure to disclose material information may constitute misrepresentation when the insurer cannot accurately assess its risk without the omitted information. *Methodist Medical,* 38 F.3d at 320. The Court has already determined that Green made misrepresentations about his medical and disability history. MCIC has established the first element.

The Court has further determined that Green intended to deceive MCIC. MCIC has established the second element.

 MCIC has established by uncontradicted affidavit that Green's misrepresentations materially affected the risk it accepted in insuring him. A misrepresentation is material if a reasonably careful and intelligent person would believe that the omitted facts substantially increased the insurer's risk under the policy and might cause the insurer to reject the application. *Methodist Medical,* 38 F.3d at 320. Materiality may be established by testimony of the insurer or its representative. *Id.* Summary judgment is appropriate where the misrepresentation is "of such a nature that no one would dispute its materiality." *Id.*

A reasonable person would have to believe that a long history of serious illness and serial hospitalizations substantially increased MCIC's risks under the disability policies. No one can dispute that an assertion of lifelong perfect health by someone actually suffering from Green's illnesses is not material. MCIC has established the second element in this manner also.

Green argues that MCIC cannot rescind the policies because they have now become incontestable under Illinois law. Section 357.3 of the Illinois Insurance Code, pertaining to Health and Accident Insurance, provides in part:

> After 2 years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such 2 year period.

215 ILCS 5/357.3.

However, Green is mistaken in his application of this law. MCIC sent him a letter of rescission on February 6, 1995, less than one year from the March 4, 1994 date of issue on the policy. MCIC also filed its complaint seeking rescission in Circuit Court on September 13, 1995, well within the two-year limit set by the statute.

Even if Green were correct about the time limits set by the statute, he still could not prevail. The statute expressly allows rescission based on fraudulent misstatements at any time.

The disability policies are rescinded and declared void. MCIC must refund to Green the premiums paid for the rescinded policies in the amount of $3,257.19. The premiums will be offset against Green's debt.

### 4. Green's Second Amended Counterclaim

In Counts I and III of the Counterclaim, Green seeks more than one million dollars in damages and costs from MCIC on the theory that MCIC breached the disability insurance contracts. Those contracts are rescinded and void due to Green's fraud. Summary judgment in favor of MCIC will

be entered on Counts I and III of Green's Second Amended Counterclaim.

## C. Green's Motion for Summary Judgment and Motion to Dismiss

The Court grants MCIC's motion for summary judgment on Counts I and III of Green's Second Amended Counterclaim. The other four counts of Green's Second Amended Counterclaim are dismissed without prejudice. Therefore, for reasons already stated, the Court will deny Green's Motion for Summary Judgment on his Second Amended Counterclaim.

The Court grants summary judgment in MCIC's favor on its claim under § 523(a)(2)(A). Therefore, for reasons already stated, it will deny Green's motion for summary judgment on that claim. It will also deny his motion to dismiss that claim.

As discussed above, the Court will grant Green's motion for summary judgment on MCIC's claims under § 523(a)(6). Green's motion to dismiss this claim will accordingly be denied.

## VI. CONCLUSION

Green's Motion to Exclude All Medical Information Not Within the Four Corners of the Contract is denied.

Counts II, IV, V, and VI of Green's Second Amended Counterclaim are dismissed without prejudice for lack of subject matter jurisdiction.

MCIC's Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted in favor of MCIC on Counts I and III of Green's Second Amended Counterclaim. The disability insurance policies are rescinded and void. Due to that rescission, MCIC must refund to Green the premiums, in the amount of $3,257.19, paid on the rescinded policies. The premium refund will be offset against the MCIC claim.

Partial summary judgment is granted on MCIC's complaint. The debt that Green owes to MCIC, in the amount of $39,940.05 for benefits paid, is nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(A). Judgment shall enter in favor of MCIC and against Green in the amount of $36,682.86, the amount of the debt less the offset premiums.

MCIC's motion for summary judgment on its claim under § 523(a)(6) is denied; the debt that Green owes to MCIC, in the amount of $8,515.53, for sanctions awarded by the Circuit Court is discharged in bankruptcy. Summary judgment is entered in favor of Green on this claim.

Green's motion for summary judgment is otherwise denied. Green's Motion to Dismiss is denied.